

# Fourth Court of Appeals

## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-24-00604-CR

Shawn L. **SANDERS**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 226th Judicial District Court, Bexar County, Texas
Trial Court No. 2023-CR-3165
Honorable Lisa Jarrett, Judge Presiding

Opinion by:    Adrian A. Spears II, Justice

Sitting:       Irene Rios, Justice
               Lori Massey Brissette, Justice
               Adrian A. Spears II, Justice

Delivered and Filed: January 14, 2026

AFFIRMED

After a jury found Shawn L. Sanders guilty of possessing more than one gram, but less than four grams, of methamphetamine, Sanders and the State agreed to his punishment being assessed at twenty-five years of imprisonment. The trial court then assessed punishment in accordance with this agreement. On appeal, Sanders argues the evidence is insufficient to show that he possessed more than one gram of methamphetamine and that the trial court abused its

discretion in failing to suppress evidence obtained as a result of a warrantless search. We affirm the judgment of the trial court.

## SUFFICIENCY

Sanders argues the evidence is insufficient to show that he possessed more than one gram of methamphetamine. We review the sufficiency of the evidence under the usual standard of review. *See Martin v. State*, 635 S.W.3d 672, 679 (Tex. Crim. App. 2021); *Edward v. State*, 635 S.W.3d 649, 655 (Tex. Crim. App. 2021).

The record reflects that on January 8, 2022, at approximately 4:00 a.m., Officer Brandon Tamayo, a certified peace officer with the VIA Transit Police Department, was patrolling Walzem Road and Interstate 35 when he saw a vehicle in front of him with a paper temporary license tag that appeared to have been altered to reflect a valid date. When Officer Tamayo ran the temporary tag number, he discovered that the temporary tag had a different expiration date and that the temporary tag was expired. Officer Tamayo testified that altering a temporary tag is an offense. He then entered the VIN number from the temporary tag into his computer and discovered that the vehicle was reported stolen. Officer Tamayo testified that he then made a high-risk felony traffic stop.

After the driver of the vehicle parked in a restaurant parking lot, Officer Tamayo activated his lights and ordered the occupants to show their hands. When the driver exited the vehicle, Officer Tamayo placed the driver in handcuffs. Officer Tamayo then ordered the passenger out of the vehicle and placed him in handcuffs. Sanders was the passenger in the vehicle. Officer Tamayo testified that Sanders was detained and placed in handcuffs because he was a passenger in a reported stolen vehicle.

Officer Tamayo's cover officer, Officer Rodriguez, later arrived at the scene. Officer Rodriguez, who was also with VIA's police department, was asked by Officer Tamayo to pat down Sanders. Officer Rodriguez testified, "A 'pat down' is for officer safety. [The] [m]ain concern is officer safety for any weapons, anything that could hurt us in any shape or form." Officer Rodriguez testified that when patting down Sanders, he was looking for anything that could harm an officer, including any liquids. Officer Rodriguez explained that liquids can be harmful because they could be acids or liquid fentanyl.

As Officer Rodriguez was patting down Sanders on the outside of his pants, Officer Rodriguez saw a round-shaped container in Sanders's pocket. Officer Rodriguez asked Sanders what the object was. Sanders replied that the object was "ice," which Officer Rodriguez testified he knew to be the street name for crystal methamphetamine. Officer Rodriguez testified that Sanders had not been given his *Miranda* warnings at that point because Sanders had been merely detained. Officer Rodriguez handed the small container to Officer Tamayo and waited for Officer Tamayo to read Sanders his *Miranda* rights.

Officer Tamayo then performed a field test kit on the substance inside the small container. The field test was positive for methamphetamine. Officer Tamayo collected the evidence and later placed it in the property room where it was later sent to the DPS state crime lab for testing. Officer Tamayo then arrested Sanders.

The lab report from the DPS state crime lab was admitted in evidence. It stated that the "white crystalline substance" found in the plastic container contained "1.08 grams (+/- 0.06 grams) net weight" of methamphetamine.

Video footage from Officer Tamayo's and Officer Rodriguez's body cameras was admitted in evidence.

On appeal, Sanders argues the evidence is insufficient to show that he possessed more than one gram of methamphetamine. Specifically, Sanders emphasizes that video footage from Officer Tamayo's body camera shows Officer Tamayo spilling a small amount of the white substance from the small container on the hood of his police car, putting some of the white substance into his field-testing kit, and then sweeping the remaining powder back into the small container. According to Sanders, it would only "have taken the introduction of 0.021 grams of a foreign substance into the powder found on [him] to elevate it from below one gram to 1.02 grams, which is the lower limit of the State's measurement of 1.08 grams +/- 0.06 grams." Sanders complains that there was no evidence regarding the ability of crystal methamphetamine to absorb moisture.

In response, the State points out it was required to prove Sanders intentionally and knowingly possessed a "controlled substance," which in this case was methamphetamine. *See* TEX. HEALTH & SAFETY CODE § 481.115(c). A "controlled substance" is defined as "a substance, including a drug, an adulterant, and a dilutant listed in Schedules I through V or Penalty Group 1, 1-A, 1-B, 2, 2-A, 3, or 4." *Id*. § 481.002(5). "The term includes the aggregate weight of any mixture, solution, or other substance containing a controlled substance." *Id*. "Adulterant or dilutant" is defined as "any material that increases the bulk or quantity of a controlled substance, regardless of its effect on the chemical activity of the controlled substance." *Id*. § 481.002(49).

The State emphasizes that Oscar Casarez, a forensic scientist with the DPS state crime lab, testified that he weighed the methamphetamine at issue in this case, and its weight was 1.08 grams, plus or minus .06 grams. He testified that the sample he tested was not wet, and that if it had ever been wet, any wetness had evaporated by the time he tested it. Casarez was asked to watch the footage of Officer Tamayo conducting the field test on the substance by spilling the white substance on the hood of his car. Casarez agreed that it appeared the hood of the vehicle was wet

- 4 -

from the rain. When asked if the officer's action of scraping the substance back into the container could have added some liquid, and therefore weight, back into the container, Casarez testified that based on what he received in the crime lab, the officer had not added any liquid weight by scraping the substance back into the container during the field test. In reviewing all the evidence, we conclude a rational trier of fact could conclude beyond a reasonable doubt that Sanders possessed methamphetamine in an amount more than one gram but less than four grams. *See Melton v. State*, 120 S.W.3d 339, 344 (Tex. Crim. App. 2003) (explaining that the State is not required to determine "the amount of controlled substance *and* the amount of adulterant and dilutant that constitute the mixture" and thus the State had "to prove only that the aggregate weight of the controlled substance mixture, including adulterants and dilutants, equals the alleged minimum weight").

### MOTION TO SUPPRESS

Sanders argues the trial court erred in denying his motion to suppress the evidence related to the stop of the vehicle. In denying the motion to suppress, the trial court signed findings of fact and conclusions of law. The trial court found the testimony of Officer Tamayo and Officer Rodriguez to be truthful and credible. The trial court also reviewed the video footage from the officers' body cameras. The trial court determined that Officer Tamayo was justified in conducting a *Terry* stop of the vehicle because he had reasonable suspicion that the vehicle was stolen. *See Terry v. Ohio*, 392 U.S. 1, 22 (1968). Thus, the trial court concluded Officer Tamayo had reasonable suspicion to stop and detain the driver and passenger. *See Brown v. State*, 830 S.W.2d 171, 174-75 (Tex. App.—Dallas 1992, pet. ref'd) (concluding that the officer had reasonable suspicion to stop a vehicle reported stolen and detain the driver and the passengers).

The trial court further concluded that because Sanders had been lawfully detained, Officer Rodriguez could conduct a limited search for weapons, or "protective frisk," because it was

reasonably warranted for his safety and the safety of others. *See Terry*, 392 U.S. at 27. The trial court determined that although Sanders was handcuffed, he was not under arrest at the time he was frisked. *See Rhodes v. State*, 945 S.W.2d 115, 117-18 (Tex. Crim. App. 1997) (holding that removing the suspect from the car, handcuffing him, and walking him back to the patrol car was reasonable to protect officer safety and did not constitute an arrest); *Hauer v. State*, 466 S.W.3d 886, 891-92 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (determining that appellant was not in custody for purposes of *Miranda*, even though the officer handcuffed him and placed him in patrol car during the DWI investigation and noting that the officer was alone at the scene and waiting for backup to assist with the investigation); *Mount v. State*, 217 S.W.3d 716, 726-27 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (holding no arrest where officers drew weapons for safety reasons during felony stop of possibly stolen vehicle).

The trial court further found that during the *Terry* frisk, "the contents of [Sanders]'s left front pocket were visible to Officer Rodriguez, and he was not certain whether the pocket contained some type of harmful substance." The trial court found that when Officer Rodriguez asked Sanders "what was in his pocket," Sanders replied, "Ice," which Officer Rodriguez "knew to be methamphetamines." The trial court noted that an officer may lawfully seize contraband discovered during a protective frisk if its "contour or mass makes its identity immediately apparent." *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993). The trial court determined that Sanders's "admission made the drugs 'immediately apparent,'" and "Officer Rodriguez was lawfully allowed to seize them from [Sanders]'s pocket." The trial court determined that once Officer Rodriguez found the methamphetamines, Officer Tamayo had probable cause to arrest Sanders for possession of illegal narcotics.

When reviewing a trial court's ruling on a motion to suppress, we give almost total deference to the court's determination of the historical facts that the record supports, especially when those fact findings are based on an evaluation of the witnesses' credibility and demeanor. *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997); *see also State v. Cullen*, 195 S.W.3d 696, 699 (Tex. Crim. App. 2006). We accord the same level of deference to the trial court's rulings on mixed questions of law and fact if those decisions turn on the credibility and demeanor of the witnesses. *Guzman*, 955 S.W.2d at 89. We review de novo mixed questions of law and fact that do not turn on witness credibility. *Id.*

Sanders first argues that Officer Rodriguez had no reason to fear his safety at the time he conducted the *Terry* frisk, because Sanders had already been handcuffed and San Antonio Police officers had arrived and were armed.

"During the course of a detention, an officer may, in certain circumstances, conduct a pat-down search of an individual to determine whether the person is carrying a weapon." *Lerma v. State*, 543 S.W.3d 184, 191 (Tex. Crim. App. 2018). "The purpose behind a pat-down is to discover whether the individual is armed and dangerous." *O'Hara v. State*, 27 S.W.3d 548, 554 (Tex. Crim. App. 2000). "That need does not disappear once the person disposes of an obvious weapon, since other weapons could be in his possession but hidden from view." *Id*. "Before conducting a pat-down search, an officer need only be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion." *Id*. at 550-51 (citation omitted). "The officer's subjective level of fear is not controlling." *Lerma*, 543 S.W.3d at 191. Nor does the officer need to be "absolutely certain that the individual is armed." *O'Hara*, 27 S.W.3d at 551. "The issue is whether a reasonably prudent person would justifiably believe that his safety or the safety of others was in danger." *Id*.

The Texas Court of Criminal Appeals has recognized that "roadside encounters between police and suspects are especially hazardous" to officers. *See Carmouche v. State,* 10 S.W.3d 323, 330 (Tex. Crim. App. 2000) (quoting *Michigan v. Long*, 463 U.S. 1032, 1049 (1983)). Here, Officer Tamayo testified at both the suppression hearing and at trial that he was suspicious of the temporary license tag because it appeared to have been altered. When he ran the temporary tag on his computer, it came back expired and with a different date than the one reflected on the temporary tag. Having obtained the VIN number of the vehicle from his search on the temporary tag, he ran the VIN number through his computer and discovered that the vehicle had been reported stolen. Thus, Officer Tamayo was not conducting a simple traffic stop. He testified that he was conducting a "high risk felony traffic stop." Given the nature of the suspected crime, it was reasonable for Officer Tamayo to conclude that someone driving a stolen vehicle could be armed and dangerous. *See Griffin v. State*, 215 S.W.3d 403, 409-10 (Tex. Crim. App. 2006) (noting that an officer's reasonable belief that a suspect is armed and dangerous may be predicated on the nature of the suspected criminal activity); *Carmouche,* 10 S.W.3d at 330 (same).

Further, Officer Tamayo testified that he was conducting a high-risk felony stop in the early morning hours. He testified that based on the circumstances, he called for additional officers to aid him. He testified San Antonio police officers arrived to cover him until officers from his department, VIA, could arrive and assist him with the felony stop. Video footage from VIA Officer Rodriguez's body camera shows the SAPD officers leaving when Officer Rodriguez arrived at the scene. While Sanders argues that no pat-down search was justified because he had been handcuffed, an officer is permitted to conduct a pat-down search for weapons even after an individual has been handcuffed if the officer has a reasonable belief such restraint is necessary for officer protection. *Enriquez v. State*, 678 S.W.3d 273, 290 (Tex. App.—San Antonio 2023, pet.

ref'd). Indeed, the Fifth Circuit has explicitly rejected the argument that the reasons for conducting a *Terry* frisk "evaporate[] once [a suspect is] handcuffed because he was no longer dangerous to the officers or the bystanders." *United States v. Sanders*, 994 F.2d 200, 208 (5th Cir. 1993). The Fifth Circuit explained that such an argument is "entirely dependent on the assumption that, by handcuffing a suspect, the police instantly and completely eliminate all risks that the suspect will flee or do them harm." *Id.* The court emphasized that this argument has "no basis in fact" as "is sadly borne out in the statistics for police officers killed and assaulted in the line of duty each year." *Id*. The court emphasized that "[h]andcuffs are a temporary restraining device," and while they limit a person's ability to use his hands and arms, they do not eliminate it. *Id*. "They obviously do not impair a person's ability to use his legs and feet, whether to walk, run, or kick." *Id*. "Handcuffs do limit a person's ability to use his hands and arms, but the degree of the effectiveness of handcuffs in this role depends on a variety of factors, including the handcuffed person's size, strength, bone and joint structure, flexibility, and tolerance of pain." *Id*. Thus, the court concluded that "[a]lbeit difficult, it is by no means impossible for a handcuffed person to obtain and use a weapon concealed on his person or within lunge reach, and in so doing to cause injury to his intended victim, to a bystander, or even to himself." *Id*. "Finally, like any mechanical device, handcuffs can and do fail on occasion." *Id*. We agree with the Fifth Circuit that the mere use of handcuffs did not eliminate any danger posed to Officer Tamayo and Officer Rodriguez. And, in applying our standard of review by considering the totality of the circumstances presented in this case, including the vehicle being reported stolen, thus creating a high-risk felony traffic stop in the early hours of the morning, we conclude the evidence supports the trial court's findings and conclusion that the *Terry* frisk was justified for officer safety.

Sanders next argues that Officer Rodriguez exceeded the scope of a *Terry* frisk by manipulating Sanders's front pocket to see what was inside of it. However, the trial court found, and the video footage confirms, that the plastic container was visible to Officer Rodriguez. Officer Rodriguez testified that when he performs a pat-down for officer safety, he looks for anything that could be used against an officer, including liquids because liquids could include acid or liquid fentanyl. Having seen the plastic container, Officer Rodriguez asked Sanders what was in the pocket and whether he needed gloves for his own safety. Sanders replied that it was "ice." Officer Rodriguez testified that he knew "ice" to be the street name for methamphetamine. The evidence thus supports the trial court's finding that Sanders's "admission made the drugs 'immediately apparent" and that "Officer Rodriguez was lawfully allowed to seize them from [Sanders]'s pocket." *See Griffin*, 215 S.W.3d at 410.

Sanders next argues that his admission that he had "ice" in his pocket should have been suppressed because he was in custody and had not been given his *Miranda* rights. Sanders emphasizes that he had been placed in handcuffs, was surrounded by law enforcement, and was not free to leave. In response, the State emphasizes that "handcuffing alone does not necessarily convert an investigative detention into an arrest." *Hauer v. State*, 466 S.W.3d 886, 891 (Tex. App.—Houston [14th Dist.] 2015, no pet.). A "person who has been handcuffed has been 'seized' and detained under the Fourth Amendment, but he had not necessarily been 'arrested.'" *State v. Sheppard*, 271 S.W.3d 281, 283 (Tex. Crim. App. 2008).

"Persons temporarily detained for the purposes of an investigation are not 'in custody' for *Miranda* purposes, and the right to *Miranda* warnings is not triggered during an investigative detention." *Hauer*, 466 S.W.3d at 893 (citing *Berkemer v. McCarty*, 468 U.S. 420, 439-40 (1984)). "Both detention and arrest involve a restraint on one's freedom of movement; the difference is in

the degree." *Ortiz v. State*, 421 S.W.3d 887, 890 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd). "An 'arrest' under the Fourth Amendment is a greater restraint upon a person's freedom to leave or move than is a temporary detention, which also restrains a person's freedom." *Sheppard*, 271 S.W.3d at 290. "Although there is no 'bright-line' rule to distinguish the two," in determining between the two, a court may examine several factors, including:

> the amount of force displayed, the duration of a detention, the efficiency of the investigative process and whether it is conducted at the original location or the person is transported to another location, the officer's expressed intent–that is, whether he told the detained person that he was under arrest or was being detained only for a temporary investigation, and any other relevant factors.

*Id.* at 291. "If the degree of incapacitation appears more than necessary to simply safeguard the officers and assure the suspect's presence during a period of investigation, this suggests the detention is an arrest." *Id.* (citation omitted).

Here, there was evidence that Sanders was detained because Officer Tamayo had determined the car Sanders was travelling in had been reported stolen. Sanders was told that the reason he was being detained was because the car had been reported stolen. There was evidence that Sanders was handcuffed for officer safety and that Officer Rodriguez had just begun his pat-down when he saw the plastic container in Sanders's pocket. Lastly, Sanders had not been taken to another location but was frisked next to the car in question. Given the totality of these circumstances, "a reasonable person would believe the seizure was to be sufficiently nonintrusive as to be only an 'investigative detention.'" *Id.* (citation omitted). Therefore, Sanders had not been arrested at the time he made the statement about "ice" being in his pocket but had instead been temporarily detained for the purposes of an investigation. Sanders was not "in custody" for *Miranda* purposes. *See Hauer*, 466 S.W.3d at 893.

Finally, Sanders argues that the trial court abused its discretion by failing to grant his motion to suppress based on Officer Tamayo's status as a VIA police officer, arguing that as a VIA officer, Officer Tamayo did not have the general authority to detain and arrest Sanders who was not on transit authority property or committing an offense against transit authority property or personnel. Under former article 2.12(22) of the Texas Code of Criminal Procedure,[1] which is applicable in this case, "peace officers" include "officers commissioned by the governing body of a metropolitan rapid transit authority" under section 451.108 of the Texas Transportation Code. *See* Former TEX. CODE CRIM. PROC. art. 2.12(21) (current version at TEX. CODE CRIM. PROC. art. 2A.001(21)). Under former article 2.13 of the Texas Code of Criminal Procedure,[2] which is applicable in this case, a peace officer has the duty "to preserve the peace within the officer's jurisdiction" and shall "(1) in every case authorized by the provisions of this Code, interfere without warrant to prevent or suppress crime; . . . [and] (4) arrest offenders without warrant in every case where the officer is authorized by law, in order they may be taken before the proper magistrate or court and be tried." *See* Former TEX. CODE CRIM. PROC. art. 2.13 (current version at TEX. CODE CRIM. PROC. art. 2A.051). Further, article 14.01(b) of the Texas Code of Criminal

---

[1]Former article 2.12 was repealed and replaced by article 2A.001 of the Code of Criminal Procedure, which became effective on September 1, 2025. *See* Acts 2023, 88th Leg., R.S., ch. 765, § 3.001(1); Act of May 16, 2025, 89th Leg., R.S., ch. 204, § 5.001 (codified at TEX. CODE CRIM. PROC. art. 2A.001(21)). Like former article 2.12(22), article 2A.001(21) defines a peace officer as "an officer commissioned by the governing body of a metropolitan rapid transit authority under Section 451.108, Transportation Code, or a regional transportation authority under Section 452.110, Transportation Code." TEX. CODE CRIM. PROC. art. 2A.001(21).

[2]Former article 2.13 was repealed and replaced by article 2A.051 of the Code of Criminal Procedure, which became effective on September 1, 2025. *See* Acts 2023, 88th Leg. R.S., ch. 765, § 3.001(1); Act of May 16, 2025, 89th Leg., R.S., ch. 204, § 5.003 (codified at TEX. CODE CRIM. PROC. art. 2A.051). Article 2A.051 states that a peace officer shall

(1) preserve the peace within the officer's jurisdiction using all lawful means;
(2) in every case authorized by this code, interfere without a warrant to prevent or suppress crime; . . .
(5) when authorized by law, arrest an offender without a warrant so the offender may be taken before the proper magistrate or court and be tried . . . ."

TEX. CODE CRIM. PROC. art. 2A.051.

Procedure permits a police officer to "arrest an offender without a warrant for any offense committed in his presence or within his view." TEX. CODE CRIM. PROC. art. 14.01(b).

VIA is a metropolitan rapid transit authority created in 1977 as authorized by the legislature. *Salvatierra v. VIA*, 974 S.W.2d 179, 181 (Tex. App.—San Antonio 1998, pet. denied). Section 451.108 of the Texas Transportation Code grants rapid transit authorities the power to commission and employ peace officers. *See* TEX. TRANSP. CODE § 451.108(a), (b). Under section 451.108(e), a peace officer

> who holds a commission under this section from an authority created before 1980 in which the principal municipality has a population of less than 1.9 million and who has filed with the authority the oath of a peace officer has *all the powers, privileges, and immunities of peace officers* in the counties in which the transit authority system is located, provides services, or is supported by a general sales and use tax while the peace officer is on the transit authority system property *or performing duties in connection with the transit authority system or its users*.

TEX. TRANSP. CODE § 451.108(e) (emphasis added). Officer Tamayo testified that he was a certified peace officer employed by the VIA Transit Police Department. His responsibilities included patrolling the VIA service area throughout Bexar County. Thus, he patrols the bus stops, transit centers, and streets of the main bus routes. He also patrols the facilities where the employees work and ensures that no one is violating the law on the bus routes, the bus stops, or on the property. He testified the VIA transit system is not only fixed bus routes but also includes services such as transportation vans that go to apartment complexes and pick up disabled individuals. If any issues arise from these services, he testified he would respond to the call even though he could be dispatched far from a VIA bus stop or bus route. Officer Tamayo testified that VIA buses start running at 4:00 a.m. Officer Tamayo encountered the vehicle in which Sanders was a passenger while driving near Walzem Road and Interstate 35, which is a roadway on which VIA operates. Officer Tamayo testified that if he witnesses a crime while travelling from a bus stop to a bus stop,

he has a duty to act. Thus, there was evidence that Officer Tamayo was performing duties in connection with VIA when (1) he encountered the vehicle in which Sanders was a passenger, (2) observed the altered temporary license place, and (3) determined the vehicle had been reported stolen.

In his brief, Sanders concedes that Texas courts have construed section 451.108's language to permit transit peace officers to perform arrests generally within the counties as part of their duties and powers as peace officers. *See Howard v. State*, 227 S.W.3d 794, 798-99 (Tex. App.—Dallas 2006, pet. ref'd) (explaining that "[b]ased on the Texas statutory provisions set out above, a certified regional transit peace officer in the actual course and scope of the officer's employment has all the rights, privileges, obligations, and duties of any other peace officer in Texas," including "the authority to detain and arrest an offender without a warrant for any offense committed in his presence or within his view"); *Kaufman v. State*, 901 S.W.2d 653, 655 (Tex. App.—El Paso 1995, pet. ref'd) (concluding statutory authority "clearly indicates that the jurisdiction of the Metro officers is not limited to its property or the hours of operation but, rather, is co-extensive with its geographic limits, that is, the area supported by the general sales and use tax"); *State v. Elliot*, 879 S.W.2d 381, 384 (Tex. App.—Waco 1994, pet. ref'd) ("We conclude that the legislature clearly intended to broaden the jurisdiction of Metro [transit authority] police officers to include the authority to enforce the laws of this state throughout all of the area where Metro provides services or collects taxes. The officers' powers as peace officers are not limited to enforcing the laws only on property owned or controlled by Metro."). Nevertheless, Sanders "suggest[s] the better view is that [a] transit officer's grant of authority to perform arrests is limited to the enumerated classes in [section] 451.108(c) (1-2), and that powers, privileges, and immunities addressed in [section] 451.108(d)-(e) are of a more generalized nature concerning protecting the officers from civil tort

liability." We decline to adopt Sanders's interpretation and instead follow the precedent cited above.

For the reasons stated above, we hold the trial court did not err in denying Sanders's motion to suppress.

## CONCLUSION

Having determined that the evidence is sufficient to support Sanders's conviction and that the trial court did not err in denying Sanders's motion to suppress, we affirm the judgment of the trial court.

Adrian A. Spears II, Justice

DO NOT PUBLISH