Phillip George O'HARA, Appellant,

v.

The STATE of Texas.

No. 412–99.

Court of Criminal Appeals of Texas.

Sept. 20, 2000.

Gary P. Scoggins, Alice, for appellant.

Betty Marshall, Asst. State Atty., Matthew Paul, State's Atty., Austin, for State.

## OPINION

KEASLER, J., delivered the opinion of the Court, in which McCORMICK, P.J., and MANSFIELD, KELLER, and WOMACK, J.J., joined.

After a Department of Public Safety trooper stopped Phillip O'Hara's 18–wheeler for a traffic violation, O'Hara accompanied the officer to the patrol car. Consistent with his routine, and without fearing O'Hara, the officer patted O'Hara down for weapons before letting him into the car. We must decide whether a pat-down search can be justified as a matter of routine and whether an officer must be afraid before a pat-down search is justified. The answer to both questions is "no."

### Facts

Trooper Phillip Muhler's duties included enforcing federal motor carrier regulations on commercial vehicles. He was sitting alone in his patrol car at 3:30 a.m. in a rural area when he noticed O'Hara's truck drive by with malfunctioning clearance lights. He stopped the truck and conducted his standard safety inspection. During the investigation, Muhler asked for and was refused permission to search O'Hara's suitcase. Muhler noticed that O'Hara was wearing a "belt knife," but he allowed O'Hara to wear it throughout the inspection. Some portions of that inspection involved Muhler and O'Hara being in close proximity to each other.

After the inspection was complete, Muhler told O'Hara to get his paperwork and they would go back to the patrol car for Muhler to write his report. Muhler asked O'Hara to leave the knife in the truck, and O'Hara complied. When they got to the patrol car, Muhler told O'Hara that he would "let" him sit inside the car while Muhler wrote the report, but before he could do so, he would need to pat him down to be sure he did not have any weapons. Muhler testified that it was his "standard procedure" when writing an inspection report to have the individual sit inside his patrol car while he wrote it, but only after he first patted the person down for safety. When Muhler patted O'Hara down, he found marijuana. He arrested O'Hara and later found cocaine.

### Procedural History

O'Hara was charged with possessing between one and four grams of cocaine. He filed a motion to suppress the marijuana and cocaine, which the trial court denied. He was found guilty by a jury and sentenced to two years in prison.

The court of appeals reversed the conviction.[1] It found "no specific articulable facts to suggest that Muhler reasonably believed that O'Hara was armed and dan-

---

1. *O'Hara v. State,* 989 S.W.2d 132 (Tex.App.— San Antonio 1999).

gerous"[2] and held the pat-down search was illegal.[3] The court reasoned that "Muhler did not testify that he was afraid of O'Hara or that he thought he was armed."[4] It noted that "Muhler offered no testimony to indicate that these specific facts caused him to believe his safety was in danger."[5] Finally, the court stated that "Muhler's only basis for the pat-down search was that it was his routine to pat someone down before allowing him into his patrol car. [But] routine does not justify a pat-down search."[6]

We granted the State's petition for discretionary review. It asks two questions:

- Can a pat-down search be justified even if the officer does not say he feared for his safety or the safety of others?

- Can a pat-down search be justified as a matter of routine before an individual is allowed into a patrol car?

### Standard of Review

■ In reviewing a trial court's ruling on a motion to suppress, we give "almost total deference to a trial court's determination of historical facts" and review *de novo* the court's application of the law of search and seizure.[7] In this case, the trial court did not make explicit findings of historical

fact, so we review the evidence in a light most favorable to the trial court's ruling.[8]

### Legal Background

In the Court of Appeals, O'Hara mentioned both the Fourth Amendment to the U.S. Constitution and Article I, § 9, of the Texas Constitution in his point of error, but his argument discussed only the Fourth Amendment. The Court of Appeals' opinion mentioned both authorities in passing but discussed only Fourth Amendment law. We limit our analysis to the Fourth Amendment.[9]

■ The Fourth Amendment prohibits unreasonable searches and seizures.[10] Searches conducted without a warrant are unreasonable *per se* under the Fourth Amendment, subject only to a few specifically established and well-delineated exceptions.[11] One exception to the warrant requirement occurs when an officer is justified in believing that an individual is armed and presently dangerous. In that situation, the officer may conduct a pat-down search to determine whether the person is carrying a weapon.[12] It would be unreasonable to deny a police officer the right to neutralize the threat of physical harm.[13]

■ A pat-down search is substantially less intrusive than a standard search requiring probable cause.[14] Before con-

---

**2.** *Id.* at 135.

**3.** *Ibid.*

**4.** *Id.* at 134.

**5.** *Ibid.*

**6.** *Id.* at 135, *citing Sikes v. State,* 981 S.W.2d 490 (Tex.App.—Austin 1998, no pet.).

**7.** *Guzman v. State,* 955 S.W.2d 85, 88–89 (Tex.Crim.App.1997).

**8.** *Carmouche v. State,* 10 S.W.3d 323, 327–28 (Tex.Crim.App.2000).

**9.** *See Heitman v. State,* 815 S.W.2d 681, 690–91 n. 23 (Tex.Crim.App.1991) (briefs asserting rights under Texas Constitution inadequate if they do not provide argument and authority in support).

**10.** U.S. Const. Amend. IV; *Minnesota v. Carter,* 525 U.S. 83, 88, 119 S.Ct. 469, 473, 142 L.Ed.2d 373 (1998).

**11.** *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967).

**12.** *Minnesota v. Dickerson,* 508 U.S. 366, 373, 113 S.Ct. 2130, 2136, 124 L.Ed.2d 334 (1993).

**13.** *Michigan v. Long,* 463 U.S. 1032, 1034, 103 S.Ct. 3469, 3473, 77 L.Ed.2d 1201 (1983).

**14.** *Michigan v. Summers,* 452 U.S. 692, 697–98, 101 S.Ct. 2587, 2591–92, 69 L.Ed.2d 340 (1981), *citing Dunaway v. New York,* 442 U.S. 200, 210, 99 S.Ct. 2248, 2255, 60 L.Ed.2d 824 (1979).

ducting a pat-down search, an officer need only be able to "point to specific and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion."[15] The Supreme Court has been "careful to maintain" the "narrow scope" of the pat-down exception.[16]

Whether a Fourth Amendment violation has occurred "turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time, and not on the officer's actual state of mind at the time the challenged action was taken."[17] The officer need not be absolutely certain that the individual is armed. The issue is whether a reasonably prudent person would justifiably believe that his safety or that of others was in danger.[18]

### Articulation of Fear

The State first contends that the Court of Appeals erred in holding that because Muhler did not testify that he was afraid of O'Hara or felt that he was in any danger, the search was invalid. We agree. Regardless of whether Muhler stated he was afraid, the validity of the search must be analyzed by determining whether the facts available to Muhler at the time of the search would warrant a reasonably cautious person to believe that the action taken was appropriate.[19] As the Fifth Circuit has stated, there is "no legal requirement that a policeman must feel 'scared' by the threat of danger" because "[s]ome foolhardy policemen will never admit fear."[20]

O'Hara argues that this is not a case in which the officer merely fails to testify that he was afraid. Rather, this is a case in which the officer affirmatively testified that he was not afraid. The Court of Appeals also noted that Muhler testified he was not afraid of O'Hara.[21] But this testimony is irrelevant for two reasons. First, it occurred at trial, not at the hearing on O'Hara's motion to suppress evidence. On appellate review, we must examine the record as it existed at the time of the suppression hearing.[22] Second, under an objective analysis, it does not matter whether Muhler testified that he was afraid or was not afraid.

### Routine

The State argues in its second ground for review that a pat-down search can be justified as a matter of routine before allowing an individual into a patrol car. The State contends that the Court of Appeals' opinion that routine alone is insufficient conflicts with *White v. State*[23] and *Boone v. State*.[24]

In *White*, the police officer was led to the defendant through an informant, who said the defendant had some "information" about a robbery.[25] The defendant told the officer he knew who had been driving the victim's truck, and offered to point out a house where the officer could find the rob-

**15.** *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968).

**16.** *Ybarra v. Illinois*, 444 U.S. 85, 93, 100 S.Ct. 338, 343, 62 L.Ed.2d 238 (1979).

**17.** *Maryland v. Macon*, 472 U.S. 463, 470–71, 105 S.Ct. 2778, 2783, 86 L.Ed.2d 370 (1985) (internal citations omitted).

**18.** *Terry*, 392 U.S. at 27, 88 S.Ct. at 1883.

**19.** *See Davis v. State*, 947 S.W.2d 240, 242–43 (Tex.Crim.App.1997).

**20.** *United States v. Tharpe*, 536 F.2d 1098, 1101 (5 th Cir.1976), *overruled in part on other grounds, United States v. Causey*, 834 F.2d 1179 (5 th Cir.1987).

**21.** *O'Hara*, 989 S.W.2d at 134.

**22.** *Hoyos v. State*, 982 S.W.2d 419, 422 (Tex. Crim.App.1998); *Vargas v. State*, 838 S.W.2d 552, 556–57 (Tex.Crim.App.1992).

**23.** 874 S.W.2d 229 (Tex.App.—Houston [14 th Dist.] 1994), *pet. dism'd*, 890 S.W.2d 69 (Tex. Crim.App.1994).

**24.** 735 S.W.2d 306 (Tex.App.—Dallas 1987, no pet.).

**25.** 874 S.W.2d at 231.

ber.[26] The officer performed a routine frisk of the defendant before allowing him into his patrol car.[27] The court of appeals held that when an officer explains that it is police policy to perform a weapons search before allowing an individual to ride in a patrol car, and the person consents, the search is justified.[28] Since the defendant volunteered to get in the patrol car, he was subject to a weapons frisk.[29]

In *Boone*, two police officers were on routine patrol when the defendant flagged them down.[30] She appeared injured and intoxicated, and asked the officers to take her to the hospital.[31] She was carrying a bulky purse, so before allowing her into the squad car, the officers asked her consent to search the purse for their own safety.[32] She agreed.[33] The court of appeals found no Texas authority on whether officers transporting a person in distress may condition that transportation upon the person's first consenting to a weapons frisk.[34] But the court found the reasoning in *California v. Scott*[35] persuasive and followed it. In *Scott*, the California court found a pat-down search permissible if the officer informs the individual that he has the right to refuse to get into the car, but if he does get in, he will be subject to a pat-down search for weapons.[36] Based on *Scott*, the court of appeals in *Boone* found the search of the defendant's purse permissible because she was informed that if

she got into the patrol car, she would be subjected to the search, and she consented to the search.[37]

The Court of Appeals relied on *Sikes*[38] in holding a "routine" pat-down impermissible. In *Sikes*, a university campus police officer saw an individual put his hand through the plastic lining window of a jeep, then remove it, return to a waiting vehicle, and drive away.[39] Thinking he had just observed a burglary of a vehicle, the officer stopped the car.[40] The driver of the car gave permission to search the car, so the driver and the defendant were ordered out of the vehicle.[41] It was midafternoon, and the defendant was entirely cooperative, did not appear dangerous, and was being observed by a second officer during the vehicle search.[42] Despite these innocuous conditions, the officer patted the defendant down for weapons, later testifying "I do a pat-down search whenever we search a vehicle to make sure that they [do] not pull out something while we're searching the vehicle."[43] The court of appeals held that there were no specific, articulable facts to support any concern for the officer's safety.[44] The only justification for the frisk was the officer's routine, and the court held that "[c]onstitutional protections against unreasonable searches cannot be whittled away by police regula-

26. *Ibid.*

27. *Ibid.*

28. *Id.* at 234, *citing Livingston v. State*, 739 S.W.2d 311, 328 (Tex.Crim.App.1987).

29. *Ibid.*

30. 735 S.W.2d at 307.

31. *Ibid.*

32. *Ibid.*

33. *Ibid.*

34. *Id.* at 308.

35. 16 Cal.3d 242, 128 Cal.Rptr. 39, 546 P.2d 327 (1976).

36. *Boone*, 735 S.W.2d at 309, *citing Scott*, 16 Cal.3d at 250, 128 Cal.Rptr. at 44–45, 546 P.2d at 332–33.

37. *Ibid.*

38. 981 S.W.2d at 490.

39. 981 S.W.2d at 491.

40. *Ibid.*

41. *Ibid.*

42. *Ibid.*

43. *Ibid.*

44. *Id.* at 494.

tions or standard operating procedure." [45]

*White* and *Boone* hold that if an individual volunteers to ride in a police car, he may be subjected to a routine pat-down search before being allowed in the car. But under *Sikes* if the person does not get into the patrol car, the pat-down may not be justified purely as a matter of routine. Instead, there must be specific, articulable facts justifying the search.

▆▆▆ Our case falls somewhere between the voluntary entry into the patrol car in *White* and *Boone* and the unjustified routine pat-down in *Sikes*. Here, O'Hara did not volunteer to get into Muhler's patrol car. Rather, Muhler "told" O'Hara that "we'd go on back to the car" to write the report, and "told" him "that I would go ahead and let him sit inside the front seat with me in the car and before I let him sit inside I would need to pat him down." Muhler did not tell O'Hara that he had the right to refuse to get into the car. On the contrary, Muhler testified that it was his "standard procedure" for drivers to sit inside his patrol car while he filled out paperwork.

The State argues that a routine pat-down search of this sort is permissible. But taking the State's logic to its natural conclusion would completely dispense with the rule in *Terry*. The Supreme Court has stated that a police officer can, as a matter of routine, order a suspect out of his car during a traffic stop.[46] Under the State's theory, once an officer has ordered a person out of his car, the officer could always, as a matter of routine, order the person to sit in the patrol car, and then always, as a matter of routine, frisk for weapons before allowing the suspect into the car. So every single traffic stop could be transformed, as a matter of routine, into a *Terry* stop. This would violate the "narrow scope" of *Terry* and dispense with any need for an officer to have specific and

articulable facts to justify his actions. As the *Sikes* court noted, we have held that "the Fourth Amendment protection against seizures cannot be whittled away by a police regulation." [47] We reject the State's argument that routine alone is sufficient to justify a pat-down.

### Application of Law to Facts

Having determined that there was no need for Muhler to testify that he was afraid of O'Hara, and that mere routine is insufficient to justify a pat-down search under the Fourth Amendment, we must now decide whether there were sufficient specific and articulable facts in this case to warrant a person of reasonable caution to believe the pat-down search of O'Hara was necessary.

▆▆▆ The State argues the officer's action was justified under an objective standard because Muhler was alone, it was the middle of the night in a rural area, and O'Hara had a "belt knife." We agree. It is true that there is no description of the "belt knife" in the record, so we cannot discern its size, type, or appearance. But whether the knife was an imposing Butcher knife, a switchblade, or a Swiss Army knife does not matter. What does matter is that it could have been used as a weapon. As a result, a reasonable person in Muhler's situation would have been justified in fearing for his safety.

One could argue that Muhler obviated the need for a pat-down by having O'Hara remove the knife before accompanying him to the patrol car. At that point, the argument goes, there was no longer any reason to fear O'Hara. But this argument fails for two reasons. First, Muhler would have been justified in patting O'Hara down long before he and O'Hara arrived at the patrol car. When Muhler was conducting the safety inspection, with O'Hara close to

---

**45.** *Ibid.*

**46.** *Pennsylvania v. Mimms*, 434 U.S. 106, 111, 98 S.Ct. 330, 333, 54 L.Ed.2d 331 (1977).

**47.** *Benavides v. State*, 600 S.W.2d 809, 812 (Tex.Crim.App.1980).

him, a reasonable person would have been justified in requiring O'Hara to remove his knife at that time and in patting O'Hara down immediately to determine if he possessed any other weapons. The fact that Muhler did not pat O'Hara down until some time later does not invalidate what would have otherwise been a valid pat-down.

Second and more importantly, a reasonable person in Muhler's shoes still would have been justified in fearing for his safety even after O'Hara removed the knife. Just because the belt knife was no longer accessible to O'Hara when he stood at the patrol car does not alter the reality that he could have possessed additional weapons on his person. The purpose behind a pat-down is to discover whether the individual is armed and dangerous. That need does not disappear once the person disposes of an obvious weapon, since other weapons could be in his possession but hidden from view.

The dissent concedes that Muhler would have been justified in patting O'Hara down at the time of the safety inspection.[48] But the dissent argues that conducting the pat-down later, rather than sooner, rendered it subsequently unjustified. The dissent cites no caselaw for this temporal distinction, and we have been unable to locate any. In relying on the timing of the pat-down, the dissent necessarily views a selected time period rather than the entire episode. We decline to limit our analysis to the few seconds or minutes preceding the pat-down. Instead, we take into account everything that Muhler observed from the moment O'Hara's truck drove by,

including the fact that O'Hara was at one time wearing a knife.

In addition, the dissent views the facts subjectively, which is exactly what the law forbids us to do.[49] The dissent notes that Muhler "apparently believ[ed] that [O'Hara] was not dangerous"[50] and that Muhler spent time with O'Hara without "trepidation."[51] The dissent also finds relevant the fact that Muhler testified at trial that he does not pat-down female truck drivers. Of course, since this testimony occurred at trial, it is not relevant to our analysis of the trial court's ruling on the motion to suppress.[52] Moreover, it is again focusing on Muhler's subjective thought processes rather than the objective facts surrounding the pat-down.

Finally, the dissent argues that our opinion sanctions routine pat-downs.[53] We respectfully disagree. On the contrary, we have stated unequivocally that routine alone is insufficient to justify a pat-down.[54] But reaching that conclusion does not mean that every pat-down conducted as a matter of routine will automatically be overturned by this Court. It is our job to look at all the facts surrounding the pat-down objectively and determine if a reasonable person in the officer's position would have been justified in patting the individual down. In doing so, we recognize that sometimes, even when an officer erroneously conducts the pat-down as a matter of routine, the objective facts will nevertheless justify the pat-down. We are not approving all routine pat-downs; we are merely performing our role as an appellate court by conducting the analysis

48.  *Post,* op. at 557 (Johnson, J., dissenting).

49.  *Macon,* 472 U.S. at 470–71, 105 S.Ct. at 2783.

50.  *Post,* op. at 556 (Johnson, J., dissenting).

51.  *Post,* op. at 557 (Johnson, J., dissenting).

52.  *See Hoyos,* 982 S.W.2d at 422; *Vargas,* 838 S.W.2d at 556–57.

53.  *Post,* op. at 557 – 558 (Johnson, J., dissenting).

54.  *Ante,* op. at 553.

that the Supreme Court instructs us to do.[55]

The purpose of the pat-down search is to protect an officer's safety. The Supreme Court noted in *Terry* that it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties.[56] Indeed, that Court has specifically recognized "the inordinate risk confronting an officer as he approaches a person seated in an automobile." [57] Since Muhler was alone in the middle of the night, and O'Hara had been wearing a knife, Muhler was objectively justified in patting O'Hara down for his own safety.

## Conclusion

We conclude Muhler's pat-down search of O'Hara satisfied the Fourth Amendment. We reverse the decision of the court of appeals and remand the case to that court to consider O'Hara's second point of error.

MANSFIELD, J., delivered a concurring opinion.

JOHNSON, J., delivered a dissenting opinion, in which MEYERS, PRICE, and HOLLAND, J.J., joined.

MANSFIELD, J., delivered the concurring opinion.

The facts of this case are largely undisputed. DPS Trooper Muhler, while on routine patrol alone near Premont, Texas, stopped appellant's tractor-trailer truck because the truck's side marker lamps were malfunctioning. It was 3:30 AM at the time of the stop and the area where the stop occurred is very rural. Trooper Muhler told appellant to get his paper work and to meet him at the patrol car. He also told appellant to leave his belt knife in the cab of his truck.[1]

Once appellant arrived in front of the patrol car, Trooper Muhler told him he could sit inside the patrol car but that he would first have to pat down appellant to make sure appellant had no weapons. Trooper Muhler testified he always patted down persons before allowing them into his patrol car "for his own safety." While doing a pat down of appellant, Trooper Muhler felt a hard metallic object in appellant's left front pocket, which turned out to be a clip inside a bag of marihuana. Appellant was arrested for possession of marihuana and then for possession of cocaine after he was observed dropping packets of cocaine on the ground.

Generally, a police officer may search a suspect where there is reason to believe a suspect is armed and dangerous and the suspect is suspected of a violent crime or dealing in large amounts of drugs. However, for minor offenses, such as the traffic offense for which appellant was initially stopped, there must be other circumstances present. These circumstances may, but not necessarily, include: a bulge in the suspect's pocket, information the suspect was known to have carried a weapon, an aggressive attitude of the suspect, or some other factor requiring the officer to turn away from the suspect and thus leaving himself vulnerable. See 4 LaFave, *Search and Seizure*, § 9.5(a) at 252 (1996).

In the present case, the following factors were present:

(1) Trooper Muhler was on patrol by himself.

(2) It was dark at the time of his stop of the appellant, i.e., it was 3:30 AM.

(3) The location of the stop was rural, and assistance, had Trooper Muhler needed it, was not nearby.

(4) Appellant did have a weapon, though it was in plain view and appellant

---

**55.** *See Macon,* 472 U.S. at 470–71, 105 S.Ct. at 2783; *Terry,* 392 U.S. at 27, 88 S.Ct. at 1883.

**56.** *Terry,* 392 U.S. at 23, 88 S.Ct. at 1881.

**57.** *Mimms,* 434 U.S. at 110, 98 S.Ct. at 333.

**1.** The knife was in plain view and hung from appellant's belt. The record does not indicate the type and size of the knife.

removed it at Trooper Muhler's request.

(5) Trooper Muhler, while completing his paperwork, had to divert his attention from appellant and thus was left vulnerable should appellant have attempted to attack him, particularly within the close quarters of his patrol car.

Given the above facts and circumstances, Trooper Muhler's pat-down of appellant was objectively reasonable. See *United States v. Douglas,* 964 F.2d 738, 741 (8th Cir.1992); *White v. State,* 874 S.W.2d 229, 234 (Tex.App.-Houston [14th Dist.] 1994); *Michigan v. Long,* 463 U.S. 1032, 1050, 103 S.Ct. 3469, 3481, 77 L.Ed.2d 1201 (1983). The admission by Trooper Muhler that he always pats down individuals before allowing them in his patrol car, while perhaps objectively unreasonable in some instances, was not in this instance. The applicable test is whether the pat-down is *objectively* reasonable, not whether the officer testifies he was actually in fear of his safety. *LaFave, supra,* at 253. *United States v. Baker,* 47 F.3d 691, 693–694 (5th Cir.1994). See also, *United States v. Tharpe,* 536 F.2d 1098, 1101 (5th Cir.1976), overruled in part on other grounds, *United States v. Causey,* 834 F.2d 1179 (5th Cir. 1987).

Finally, it should be noted appellant fully consented to the pat-down search. The search would have never occurred had appellant simply declined Trooper Muhler's invitation to enter the patrol car.

Nothing in the record indicates appellant was under compulsion to enter the patrol car, nor were there any circumstances (e.g., bad weather) that a reasonable person would have found to have overridden the freedom of choice to stay outside the patrol car and thereby avoid being subject to a pat-down search.

With these comments I join the opinion of the Court.

JOHNSON, J., filed a dissenting opinion, in which MEYERS, PRICE, and HOLLAND, JJ., join.

I respectfully dissent.

The majority asserts that the timing of the pat-down is irrelevant. *Ante,* at 554. I disagree. Although the officer noticed that appellant was wearing a "belt-knife"[1] throughout the inspection, he did not, at that time, request appellant to remove it. Nor did the officer, upon noticing the knife, perform a pat-down search for his own safety. It was not until after the entire inspection had been completed that the officer asked appellant to remove the knife and subsequently performed the pat-down search. The record is not clear as to the amount of time that elapsed from the moment when the officer saw the knife until he performed the pat-down, although it appears, based on the following events, that it was more than just a brief moment.

Pursuant to the traffic stop on April 11, 1997, the officer approached appellant and informed him that he would perform a safety inspection of appellant's commercial vehicle. The officer began the inspection by testing the front of the vehicle for high beam lights, low beam lights, right turn signal, left turn signal, windshield wipers, identification lights, clearance lights and horn. The officer then returned to the cab of the truck and informed appellant of the next steps of the inspection. The officer observed the side marker lights on the side of the trailer, then walked to the back of the truck, where he tested the brake lights, right turn signal, left turn signal, license plate light, and identification lights. Upon completion of these steps, he walked back up the right side, inspecting the side markers on the right side. At that time, the officer went all the way around the truck, inspecting all of the lights, then examined the tires on the vehicle for tread wear. The officer then stepped up on the running boards to inspect two devices lo-

---

1. The officer testified that it was not an illegal knife.

cated inside the cab of the truck. The officer continued his inspection inside the cab with appellant, noting the safety triangles and fire extinguisher, then inspecting the sleeper. The officer performed all of these procedures without conducting a pat-down, apparently believing that appellant was not dangerous. It was not until after the officer completed the inspection that he told appellant that he would "let him sit inside the front seat" of the patrol car, after conducting a pat-down.

Barring *routine* procedure, the record is devoid of any reason, such as seeking protection from inclement weather,[2] that would necessitate appellant sitting in the patrol car.[3] In fact, after performing the search, placing appellant under arrest, and handcuffing him, the officer did not put appellant in the patrol car, but left him standing against the side of the patrol car while he and another officer inventoried the truck. Therefore, I discern no reason for appellant to get in the patrol car, other than *as a matter of routine.*

A reasonably prudent officer may have believed that his safety might be in danger when the officer noticed the weapon or when the officer and appellant were together in the cab of the truck, and I agree with the majority that the officer would have been justified in patting appellant down *at that time. See ante,* at 554. However, because the officer waited until after he had completed the inspection, after appellant had willingly removed the belt-knife, and when the officer was no longer in a confined space with appellant, I do not believe that the officer was justified in patting appellant down at the time that the pat-down was actually done.

2. Nothing in the record indicates that it was raining, stormy, windy, particularly hot, or particularly cold.

3. In order to complete the inspection report, the officer testified that he would need access to his radio to run a check on appellant's driver's license and that he would need appellant to be present to answer questions. How-

The majority acknowledges that the validity of the search should be analyzed by determining whether, after considering all of the facts available to the officer at the time of the search, a reasonably prudent person would have believed that the action taken was appropriate. *See ante,* at 551. The facts available at the time of the search were (1) that the officer was alone with appellant at about 3:30 a.m.; (2) that appellant had readily removed the knife, leaving it in the cab of the vehicle and out of his reach; (3) that the officer had just spent an apparently significant amount of time in close proximity with appellant, without incident nor trepidation; (4) that the officer and appellant were no longer in a confined space; and (5) that appellant had complied with the requests of the officer, including helping the officer complete the vehicle inspection. On balance, I do not believe that these facts are sufficient to warrant an officer of reasonable caution to believe that the pat-down search of appellant was necessary; it was done merely "*as a matter of routine.*" Thus, the search violated the "narrow scope" of *Terry.*[4] *Ybarra v. Illinois,* 444 U.S. 85, 93, 100 S.Ct. 338, 343, 62 L.Ed.2d 238 (1979).

In rejecting the state's argument that the officer's routine alone justifies a pat-down, the majority properly recognizes that

taking the State's logic [that a *routine* pat-down search is permissible] to its natural conclusion would completely dispense with the rule in *Terry.* The Supreme Court has stated that a police officer can, *as a matter of routine,* order a suspect out of his car during a traffic stop. Under the State's theory, once an

ever, requiring his presence does not require that appellant sit inside the patrol car.

4. The "narrow scope" of the pat-down exception to the warrant requirement "does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked." *Ybarra,* 444 U.S. at 93, 100 S.Ct. at 343.

officer has ordered a person out of his car, the officer could always, *as a matter of routine,* order the person to sit in the patrol car, and then always, *as a matter of routine,* frisk for weapons before allowing the suspect into the car. So every single traffic stop could be transformed, *as a matter of routine,* into a *Terry* stop. This would violate the "narrow scope" of *Terry* and dispense with any need for an officer to have specific and articulable facts to justify his actions. As the *Sikes* court noted, we have held that "the Fourth Amendment protection against seizures cannot be whittled away by police regulation."

*Ante,* at 553 – 554 (emphases added) (citations omitted).

While expressing concern for and denouncing the use of such tactics as violating Fourth Amendment protections, the majority, by its holding, has sanctioned just such action. In the instant case, the officer, "*as a matter of routine,* order[ed] [appellant] out of his [truck] during a traffic stop." After appellant was out of his truck, the officer, "*as a matter of routine,* order[ed] [appellant] to sit in the patrol car." Then the officer, "*as a matter of routine,* frisk[ed] [appellant] for weapons before allowing [appellant] into the car." [5] This completed inspection stop was "transformed, as a *matter of routine,* into a *Terry* stop," violating *Terry*'s narrow scope. (All emphases added.) This practice is exactly what the majority professes to reject as a violation of Fourth Amendment rights.

Because the officer did not have sufficient specific and articulable facts to warrant the pat-down search of appellant, I believe that appellant's Fourth Amendment rights were violated and the fruits of the illegal arrest should have been suppressed. Because the majority holds otherwise, I dissent.

---

5. Although the officer performed the pat-down for weapons as a matter of routine to ensure his safety, he testified that he does not pat-down female truck drivers, albeit admitting that women can be dangerous.