IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. PD-1036-05






ADAM TROY GRIFFIN, Appellant


 

v.



THE STATE OF TEXAS







ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW 


FROM THE TENTH COURT OF APPEALS

FALLS COUNTY





 Hervey, J., delivered the opinion of the Court in which Keller, P.J., Meyers,
Womack, Keasler, Holcomb and Cochran, JJ., joined. Price and Johnson, JJ.,
dissented.


O P I N I O N


 This is a "stop and frisk," (1) "plain-feel" (2) case. The police stopped and detained appellant in
a public area to investigate whether he was selling crack cocaine. We decide that the police legally
seized crack cocaine from inside appellant's pocket during a pat-down search of the pocket.

 The evidence in this case shows that appellant was arrested for possessing a small amount
of residue cocaine in a "long plastic tube" about two days before the incident in question (the legality
of this arrest is not at issue in this case). One or two days later, a confidential informant, whom the
police considered reliable, provided the police (narcotics investigator Kingsley) with information that
appellant was selling crack cocaine at a specific location in a "drug trafficking" part of town. About
five minutes later, three law enforcement officers (Kingsley, Eskelin and Hamilton) went to that
location and saw appellant. They did not observe appellant engaged in any overt criminal activity,
but they knew that appellant carried narcotics in tubes and that appellant had been arrested a day or
two before for possessing cocaine in a "long plastic tube." (3) For example, Eskelin testified:

 Q. [PROSECUTION]: And [appellant], did you have information that he'd also been
arrested a couple of days prior to this?


 A. [ESKELIN]: One day prior, yes.


 Q. And do you know at that time what he was found to be in possession of?


 A. I believe it was a small amount of residue cocaine.


 Q. Okay. And what about containers?


 A. A long plastic tube.


 Q. Okay. Did you receive other information that he carried narcotics in tubes?


 A. Yes.


 Appellant acted nervous when he saw the police approaching him. The police did not believe
that probable cause existed for appellant's arrest at this time; but, they did stop and detain appellant
to investigate the information provided by the informant. (4) Eskelin immediately frisked the outside
of appellant's left front pocket for "officer safety" and felt two long cylindrical tubes which Eskelin
believed contained illegal narcotics based on his knowledge that appellant carried illegal narcotics
in tubes. When Eskelin felt these tubes in appellant's pocket, he instructed Hamilton to handcuff
appellant. As Hamilton handcuffed appellant, Eskelin removed the tubes from appellant's pocket
and confirmed that they contained numerous rocks of crack cocaine. Eskelin testified:

 Q. [PROSECUTION]: All right. Continue.


 A. [ESKELIN]: As we walked up to him, I asked [appellant] to stand up and place
his hands on the wall of the building. He then asked me why. At that time, I took
him by his arm and told him that he was observed engaging in activity believed to be
the sales of illegal narcotics, and I assisted him to his feet.


 Q. Okay. He was sitting down?


 A. Yes, he was.


 Q. Okay. Go ahead.


 A. He was very tense-his muscles were very tense, although he did comply with my
request. We walked approximately two to three feet to the side of the bench where
it was-the wall was open, and he did place his hands up on the wall as I requested.


 Q. Okay.


 A. At that time, I began to pat him down. I started with his left front pocket. As I
started to feel his left front pocket, [appellant] took his left hand off the wall and tried
to turn around. At that time, I took his left hand and placed it back up on the wall. 
[Hamilton] took hold of his right arm and brought it back around behind his back.


 I continued to-the pat-down, and at that time, I felt two long, cylindrical objects in
his left front pocket.


 Q. When you felt these, what did you believe it to be?


 A. Containers containing illegal narcotics, crack cocaine.


 Q. What you felt, did that match and was it consistent with what you had heard had
been found on [appellant] a couple of days prior to that that contained cocaine?


 A. Yes.


 Q. Okay. After that, what happened?


 A. At that time, when I felt the two cylindrical objects in his pocket, I told [Hamilton]
to go ahead and place handcuffs on him. As [Hamilton] was placing the handcuffs
on him, I retrieved the objects from his pocket, and there were in fact two long,
cylindrical plastic tubes containing numerous rocks of rock-like objects believed to
be crack cocaine.


 Eskelin testified that it is common practice for him to frisk a suspect he is investigating for
drug-dealing because of the possibility that the suspect might be armed.

 Q. [PROSECUTION]: When you're investigating narcotics and drug activity, is it
your common practice to pat down a suspect that you think is dealing or holding
narcotics?


 A. [ESKELIN]: Yes, it is.


 Q. And why is that?


 A. Because-especially in the area down there where drug dealers are known, in my
experience-for the possibility that they may be carrying weapons, may be a danger
to myself and others.


However, Eskelin also stated on cross-examination:

 Q. [DEFENSE]: You weren't patting him down to see if he had anything in his
pockets that might be narcotics, correct?


 A. [ESKELIN]: I was patting him down for officer safety.


 Q. How long have you known [appellant]-or known of him?


 A. A couple years.


 Q. Have you ever known him to carry a weapon?


 A. No, sir.


 Q. Did you have any reason to believe-did you receive any information whatsoever
that [appellant] was armed-


 A. No, sir.


 Q. -or that he might be dangerous?


 A. No, sir.


 Q. Either in this case or any time in the past?


 A. No, sir.


 Q. So when you say, "for officer safety," is that a routine thing that you do to
everybody?


 A. Not everybody.


 Q. Okay. But in saying it's for officer safety, you had no reason to believe and no
information present or past that he might be dangerous or carrying a weapon, correct?


 A. That is correct.


 Q. The items which you felt, you clearly knew they were not a weapon, correct?


 A. That is correct.


 Q. As a matter of fact, at that time, when you pulled them out-before you pulled
them out of his pocket, you knew that they were not a weapon?


 A. That is correct.


 Q. You knew they were of no danger to you, correct?


 A. Yes, sir.


 Q. Okay. At that point, could you-all you could tell is it was a round, cylindrical
tube, correct?


 A. Yes, sir.


 Q. Or two of them, right?


 A. Correct.


 Q. You could not feel or tell that it was-as to what was contained inside the tubes,
could you?


 A. That is correct.


 Q. Okay. And before you pulled them out of his pocket, you instructed the other
officer to place him under arrest, correct?


 A. I instructed the other officer to handcuff him, yes.


 Q. Okay. He was at that time absolutely in custody, correct?


 A. Correct.


 Q. He was not free to leave?


 A. Correct.


 Q. And at that point, then you pulled these tubes out and opened them and inspected
them, correct?


 A. Correct.


 Q. And once again, you knew before you did all this that these were not weapons?


 A. Correct.


 Q. And just one more thing: At the time you laid hands on him, he was not under
arrest for any particular offense?


 A. That is correct.

 

 Appellant's boilerplate motion to suppress generally alleged that the State's evidence was
obtained in violation of appellant's federal and state constitutional rights and unspecified state
statutory rights. Appellant claimed at the suppression hearing that the police lacked reasonable
suspicion "justifying an investigatory detention" because the only information known to the police
was that appellant was at the location where the informant said he would be.

 [DEFENSE]: That's what we have. And there's some more cases there, too. What
we have here, Judge, is they didn't go to arrest him; they went to do an investigation. 
All that they verified was [appellant] is at this corner. Any person driving by who
knew [appellant] could make that determination. That is not, in and of itself, illegal.


 When you look at the totality of the circumstances, even if this is a reliable
informant, they did nothing and confirmed nothing else. There was no future [sic]
movements; there was no actions; there was nothing else that they confirmed. They
just immediately went and started patting him down and stopped him and detained
him, of which they had no right even to-they had no right to even detain him.


 Appellant also seemed to claim that his initial warrantless investigatory detention (not his
subsequent warrantless arrest) violated state statutory law because the State did not prove that
appellant "was about to escape and there was no time to procure a warrant." (5)

 [DEFENSE]: In that case, the State-the Court found that the State failed to prove any
exception. Even though the officer had obtained information from a credible person
that the Defendant had committed a felony, the State did not prove that the Defendant
was about to escape and there was no time to procure a warrant.


 In this situation, I in fact proved the opposite. As the officers are approaching,
everybody is just standing there. Nobody tried to run away. Clearly, no evidence of
attempted-that they're about to escape; no reason why they could not have obtained
a warrant. There's no evidence of that.

 

 The trial court denied appellant's motion to suppress. The Court of Appeals decided on
direct appeal that the initial investigatory detention of appellant was based on reasonable suspicion;
that the police were justified in frisking appellant for weapons; that the warrantless seizure of the
crack cocaine from appellant's pocket during this weapons frisk was valid under the "plain-feel"
exception to the Fourth Amendment's warrant requirement; and that appellant's subsequent
warrantless arrest did not violate any state or federal constitutional provisions or any provision of
state statutory law. See Griffin v. State, No. 10-04-00069-CR slip op. at 7-11 (Tex.App.-Waco,
delivered April 13, 2005) (not designated for publication). We granted review. The ground upon
which we granted review states:

 The Tenth Court of Appeals erred and [sic] finding the search and resulting arrest of
Appellant were legal.


 Initially, we decide that the record supports a finding that the police reasonably suspected,
based on specific and articulable facts, that appellant was selling crack cocaine in a public place so
as to justify the initial stop and detention of him by the police to further investigate his behavior. 
See Terry, 392 U.S. at 21-23 (police must have specific and articulable facts which, taken together
with rational inferences from those facts, reasonably warrant police intrusion into Fourth
Amendment interests). The police had information from a reliable informant that appellant was
selling crack cocaine in a specifically-described drug trafficking area of town which is exactly where
the police found appellant minutes after receiving this information. Police knowledge of appellant's
past illegal drug activity (including his arrest for similar activity a day or two before) and his
nervousness when they approached him are other specific and articulable circumstances supporting
a finding that the police reasonably suspected that appellant was selling crack cocaine. See
Carmouche v. State, 10 S.W.3d 323, 328 (Tex.Cr.App. 2000) (police investigative detention of
defendant constitutionally justified based on reliable informant's tip and police observation of events
which served to corroborate the tip).

 This, however, is not dispositive of whether Eskelin could legally frisk the outside of
appellant's pocket for weapons. (6) This determination is made under an objective standard which is
whether the facts available to Eskelin at the time of the frisk "would warrant a reasonably cautious
person to believe that the action taken was appropriate." See O'Hara v. State, 27 S.W.3d 548, 551
(Tex.Cr.App. 2000); see also Terry, 392 U.S. at 21-22. Under this objective standard, Eskelin's
testimony that he did not subjectively fear appellant also is not dispositive of whether Eskelin could
legally frisk appellant for weapons. See O'Hara, 27 S.W.3d at 551 (under an objective analysis, it
does not matter whether officer testified that he was afraid or was not afraid of the defendant).

 And, we decide that Eskelin was objectively justified in frisking appellant for weapons. We
have recognized that it is objectively reasonable for a police officer to believe that persons involved
in the drug business are armed and dangerous. See Carmouche, 10 S.W.3d at 330 and cases cited
(objectively reasonable for police to believe that seller of narcotics might be armed because
concealed weapons are part and parcel of the drug trade). (7) We decline to hold that this does not
apply when a police officer has not known a specific drug-dealer to carry weapons in the past. It still
is objectively reasonable for a police officer to believe that this person could still be armed and
dangerous at any time he is engaged in the business of selling drugs especially when this drug-dealer
had been arrested for the same offense just two days before and moves his hand toward his pocket
during an investigative detention based on reasonable suspicion. We decline to hold that it is
objectively unreasonable for a reasonably prudent officer to protect himself by frisking a possibly
violent drug-dealer for weapons even though the officer conducting the frisk in the case at hand
testifies that he was not subjectively afraid of the suspect. See O'Hara, 27 S.W.3d at 551 (police
officer not legally required to testify that he was afraid of the suspect because some policemen will
never admit fear). (8)

 We also decide that Eskelin's removal of the plastic tubes from appellant's pocket during the
weapons frisk was valid. The record supports a finding that Eskelin immediately recognized the
tubes in appellant's pocket as contraband based on his knowledge that appellant used these types of
containers to carry illegal narcotics. See Dickerson, 508 U.S. at 375-76 (if a police officer lawfully
frisks a suspect's clothing and feels an object whose contour or mass makes its identity immediately
apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the
officer's search for weapons, and, if the object is contraband, its warrantless seizure would be
justified by the same practical considerations that inhere in the plain-view context). The identity of
these tubes as contraband evidently was so immediately apparent to Eskelin that he instructed
another officer to arrest appellant even before Eskelin removed the tubes from appellant's pocket
and confirmed their contents. This is not a case where Eskelin determined that the tubes in
appellant's pocket were contraband only after "squeezing, sliding and otherwise manipulating the
contents of [appellant's] pocket." See Dickerson, 508 U.S. at 378 (internal quotes omitted).

 Finally, the record supports a finding that appellant's arrest in a public place was
constitutionally valid because the police had probable cause to arrest appellant once Eskelin
discovered the tubes in his pocket. See Terry, 392 U.S. at 10 (if Terry stop leads to probable cause
that suspect has committed a crime, then police may make a formal "arrest"). And, as a matter of
state law, the record supports a finding that the police arrested appellant for an offense committed
in their presence. A warrantless arrest is entirely appropriate under these circumstances. See Article
14.01, Tex. Code Crim. Proc. 

 The judgment of the Court of Appeals is affirmed. 


 Hervey, J.


Delivered: December 20, 2006

Publish
1. See Terry v. Ohio, 392 U.S.1, 30-31 (1968) (holding "that where a police officer observes
unusual conduct that leads him reasonably to conclude in light of his experience that criminal
activity may be afoot and that the persons with whom he is dealing may be armed and presently
dangerous, where in the course of investigating this behavior he identifies himself as a policeman
and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to
dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and
others in the area to conduct a carefully limited search of the outer clothing of such persons in an
attempt to discover weapons which might be used to assault him" and that such "a search under the
Fourth Amendment, and any weapons seized may properly be introduced in evidence against the
person from whom they were taken").
2. See Minnesota v. Dickerson, 508 U.S. 366, 374-75 (1993) (police may seize non-weapons
contraband detected during a protective "pat-down" search for weapons under Terry when the
contraband's "contour or mass makes its identity immediately apparent").
3. The police knew that appellant had been arrested for possessing cocaine in a long plastic
tube. The testimony differed on whether the informant specifically told the police that the crack
cocaine appellant was selling in this case was in "two plastic vials." Kingsley testified at the
suppression hearing that the informant told him that the crack cocaine appellant was selling was in
"two plastic vials." Eskelin testified that he did not believe that the informant mentioned that this
crack cocaine was in "two plastic vials." 
4. Kingsley testified about the articulable circumstances that made him suspect that appellant
was selling crack cocaine when the police stopped and detained appellant for investigatory purposes.


 Q. [PROSECUTION]: As far as [appellant] doing anything suspicious, is your
knowledge of him being arrested and his criminal background, coupled with being
in a high-crime narcotics dealing area and with the information from a confidential
informant-does that make you suspicious?


 A. [KINGSLEY]: Yes, ma'am. 
5. Compare Article 14.04, Tex. Code Crim. Proc., (setting out when police may make a
warrantless arrest under state law). 
6. See Terry, 392 U.S. at 23 (crux of case was not validity of officer's investigative detention
of defendant, but rather, whether there was justification for officer's invasion of defendant's personal
security by searching him for weapons in the course of that investigation); but see Terry, 392 U.S.
at 32-34 (Harlan, J., concurring and joining majority opinion) (characterizing majority opinion in
Terry as holding that when an officer "forcibly" confronts a person suspected of a serious crime, "the
officer's right to take suitable measures for his own safely [sic] follow[s] automatically" because
there is no reason why such an officer "should have to ask one question and take the risk that the
answer might be a bullet").
7. For example, according to a December 2, 2002, Federal Bureau of Investigation press release,
approximately 23% of the 69 police officers killed in the line of duty in 2001 in incidents not related
to the events of September 11th were investigating "drug-related matters" or "suspicious persons." 
See http://www.fbi.gov/pressrel/pressrel102/leoka120202.htm. (of the 69 police officers killed in
incidents not related to September 11th, eight were slain investigating "drug-related matters" and
eight were slain investigating "suspicious persons"); see also Pennsylvania v. Mimms, 434 U.S. 106,
110 (1977) (relying on similar statistics); Terry, 392 U.S. at 24 n.21 (same). 
8. We also note that Eskelin requiring appellant to stand up and put his hands on a wall while
Eskelin frisked the outside of his pocket for "officer safety" was no more of an intrusion into
appellant's personal security than that involved in Terry. See Terry, 392 U.S. at 7 (police officer
grabbed defendant, spun him around and patted down the outside of his overcoat during which the
officer felt a pistol) and at 26 (frisk of defendant for weapons must be limited to that which is
necessary for the discovery of weapons).