NO. 07-10-00084-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL A

SEPTEMBER 14, 2010

_____

STEVE A. LIVELY, APPELLANT

v.

THE STATE OF TEXAS, APPELLEE

_____

FROM THE 364TH DISTRICT COURT OF LUBBOCK COUNTY;

NO. 2006-414,581; HONORABLE BRADLEY S. UNDERWOOD, JUDGE

_____

Before CAMPBELL and HANCOCK and PIRTLE, JJ.

**MEMORANDUM OPINION**

After the trial court denied his motion to suppress evidence, appellant, Steve A. Lively, pleaded guilty to two counts of aggravated assault with a deadly weapon[1] pursuant to a plea bargain. Per the terms of the plea bargain, he was sentenced to serve two concurrent fifteen-year sentences. He now appeals the trial court's denial of his motion to suppress. We will affirm.

_____

[1] See TEX. PENAL CODE ANN. § 22.02(a)(2) (Vernon Supp. 2009).

Factual and Procedural History

A man at a convenience store flagged down Corporal Misti Snodgrass of the Lubbock Police Department and alerted her that a boy had been begging for money and food outside the store. Snodgrass found the boy, in his early to mid-teens, at the side of the store. She noticed his thin, pale, and bruised condition and talked with him for some time to determine where he lived. The boy appeared confused or mentally slow, not able or willing to identify himself correctly or to direct Snodgrass to his residence. He explained that his parents had returned to Tennessee and left him in Lubbock.

Corporal Steve McClain joined Snodgrass at the convenience store. McClain invited the boy into his car and was driving him around an area of town that might be his neighborhood, according to the boy's unclear explanation, when the boy asked to be let out of the car and told McClain he could walk home from that point. McClain let him out of the car, and the officers followed him. The boy eventually turned into a residential alleyway. Still following behind him, the officers then encountered two men, one being appellant, the boy's father. It was only then that the officers were able to definitively identify the boy as appellant's son, Danny. Appellant explained to Snodgrass and McClain that Danny had been injured when he got into a fight with another juvenile. The officers left the scene, having accepted the explanation as somewhat reasonable. Snodgrass explained, however, that she had lingering, instinctual concerns about Danny's welfare.

Five days later, Snodgrass received a dispatch requesting that the police check on a male in his early to mid-teens who was walking barefooted down the interstate.

2

Upon her arrival, Snodgrass initially thought that the juvenile was Danny. This boy identified himself as Joe, Danny's younger brother, and bore a strong resemblance to Danny. Like Danny, Joe was thin, pale, and bore several sores, marks, and bruises. Joe, too, told Snodgrass that his parents had gone back to Tennessee and left him in Lubbock. After Snodgrass learned that this was Danny's brother, she immediately became concerned for the welfare of both Danny and Joe.

Joe appeared more alert than Danny and seemed less confused but more evasive about his address. Joe attributed his injuries to having undertaken a dare. Snodgrass persuaded Joe to get in her car so that they could, at least, get off the interstate highway. When Joe provided an address Snodgrass knew to be incorrect, it struck Snodgrass that the boy did not want to return to his house. Her observation was confirmed when, having remembered the house to which Danny had returned, Snodgrass returned to the Lively residence. Upon approaching the residence, Joe became scared and hesitant and ducked down in the back seat of the police car.

On their way to the residence, Snodgrass contacted Child Protective Services (CPS) and requested that her supervisor, Dale Gregg, and Corporal McClain come to the residence. She also contacted emergency medical services (EMS), requesting that they, too, respond to the Lively residence.

Gregg and McClain joined Snodgrass at the residence, and the officers approached the house as Joe remained in the police car. EMS was en route to the residence. An older step-brother, Josh, answered the officers' knocks and indicated that Danny was not at home, that he was out looking for Joe. Likewise, according to

3

Josh, appellant was also out looking for Joe. The officers asked to come in to check on Danny and other occupants. In response, the "uncooperative" and "angry" Josh[2] denied their request, suggested they get a warrant, and attempted to close the door. One of the officers kept a foot in the door, and the officers removed Josh from the doorway and placed him in handcuffs for officer safety.

The officers made entry into the residence and identified the other two individuals in the living room. McClain remained in the living room with Josh and the two other occupants as Snodgrass and Gregg moved on to check the rest of the house for other people. After clearing the kitchen, the two officers searched for individuals in the bedrooms. In one of the bedrooms, they found Danny who still appeared battered and bruised. As Snodgrass began to talk to Danny to determine his condition, EMS arrived at the residence. Snodgrass went outside to allow EMS to assess Joe's condition and to speak further with Joe. During this conversation, Joe told Snodgrass that he and Danny had been beaten and burned with a battery charger for a radio-controlled device. Snodgrass observed that the marks and burns on Joe's body were consistent with abuse by such a device. She re-entered the Lively house, located the charger, and seized it from the floor of the bedroom in which Danny was located despite Josh's attempts to conceal the charger by throwing clothing over it.

_____

[2] Though not well-developed in the record, there is evidence suggesting that Josh, among others, had taken part in the abuse of Danny and Joe. The investigation that followed the entry into the house revealed that the boys may have been abused with baseball bats, were made to sleep on the concrete floor of the garage, and were forced to eat habanero peppers. The officers also learned that Tennessee's equivalent to CPS had been investigating the Lively household before the family moved to Lubbock.

Appellant was charged with four counts of aggravated assault with a deadly weapon. After the trial court denied his motion to suppress, appellant pleaded guilty to two of those counts. Pursuant to a plea bargain, the trial court sentenced appellant to fifteen years incarceration and dismissed the other two counts pending against him.

Appellant contends that the trial court abused its discretion by denying his motion to suppress on two bases: (1) the officers' belief that an emergency situation existed was not reasonable, and (2) probable cause and exigent circumstances did not exist to justify entry into appellant's home.

## Standard of Review

We review a trial court's ruling on a motion to suppress evidence for an abuse of discretion. Shepherd v. State, 273 S.W.3d 681, 684 (Tex.Crim.App. 2008). In so doing, we view the facts in the light most favorable to the trial court's decision. Id. We give almost total deference to a trial court's express or implied determination of historical facts and review *de novo* the trial court's application of the law of search and seizure to those facts. Id. We will sustain the admission of the evidence if admission is reasonably supported by the record and correct on any theory of law applicable to the case. Laney v. State, 117 S.W.3d 854, 857 (Tex.Crim.App. 2003).

## Analysis

Appellant maintains that the officers in the instant case entered the Lively home for the following five reasons: (1) to investigate, (2) to gather evidence, (3) search for further victims, (4) establish suspects, and (5) to determine the well-being of Danny. He

5

contends that four of those five motivations directly involve the officers' roles as law enforcement, not directly related to the care and concern for Danny. "Clearly," he asserts, "the officers' actions here were at least partially motivated by their desire to investigate the cause of the injuries to Danny and Joe." Appellant maintains that the officers had no reasonable basis for believing that Danny was in the home or that he was in need of assistance prior to their entry.

He maintains that the warrantless entry into the house is not supported by either the emergency doctrine or the exigent circumstances exception to the warrant requirement. According to appellant, the officers entered the residence with "mixed motivations." Therefore, because the officers were not acting solely in their roles as community caretakers,[3] the emergency doctrine will not support the warrantless entry. He contends the State also failed to show that the exigent circumstances exception applied to justify the warrantless entry because the State failed to demonstrate that the

---

[3] Appellant relies on the distinction between the "roles" in which an officer acts under the emergency doctrine and exigent circumstances exception: "The exigent circumstances doctrine applies when the police are acting in their 'crime-fighting' role. . . . [T]he emergency doctrine applies when the police are acting, not in their 'crime-fighting' role, but in their limited community caretaking role to 'protect or preserve life or avoid serious injury.'" Laney, 117 S.W.3d at 861. We note, however, that this distinction may no longer be a viable one in light of Brigham City v. Stuart, 547 U.S. 398, 404–05, 126 S.Ct. 1943, 164 L.Ed. 2d 650 (2006), in which the United States Supreme Court rejects the inquiry into an individual officer's state of mind:

> It therefore does not matter here–even if their subjective motives could be so neatly unraveled–whether the officers entered the kitchen to arrest respondents and gather evidence against them or to assist the injured and prevent further violence.

Id. at 405. Stuart outlines a more holistic inquiry into whether the officer's actions were objectively reasonable under the circumstances, regardless of the subjective intent of the officer as crime fighter or community caretaker. Id. at 404–05.

officers entered with probable cause and failed to show that exigent circumstances existed at the time of the entry. We will uphold the trial court's ruling on the motion to suppress if it is correct under any theory applicable to the case. See id. With that in mind, we turn to the application of the exception to the warrant requirement that permits a warrantless search when police have probable cause with exigent circumstances.[4]

Exigent Circumstances Exception

A warrantless search of a private location will withstand judicial scrutiny if the State establishes the existence of probable cause to enter or search the specific location combined with the existence of exigent circumstances. Gutierrez v. State, 221 S.W.3d 680, 685 (Tex.Crim.App. 2007); Estrada v. State, 154 S.W.3d 604, 608–09 (Tex.Crim.App. 2005); McNairy v. State, 835 S.W.2d 101, 106–07 (Tex.Crim.App. 1991). Probable cause exists when reasonably trustworthy facts and circumstances within the knowledge of the officer on the scene would lead a person of reasonable prudence to believe that the instrumentality or evidence of a crime will be found. Gutierrez, 221 S.W.3d at 685; Estrada, 154 S.W.3d at 609. Probable cause is "the sum total of layers of information, and not merely individual layers and considerations, that a reasonable and prudent man acts upon." Estrada, 154 S.W.3d at 609 (quoting Brinegar v. United States, 338 U.S. 160, 176, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949)). Exigent circumstances involve a situation in which it is impracticable to secure a warrant. See

---

[4] That is not to say that we conclude the officers' warrantless entry was not justified under the emergency exception as discussed in Stuart, 547 U.S. at 404–05, Shepherd, 273 S.W.3d at 683–84, and Laney, 117 S.W.3d at 862–63. Because an analysis of the application of the emergency exception is not "necessary to final disposition of the appeal," we expressly decline to address that matter. Tex. R. App. P. 47.1.

Adkins v. State, 726 S.W.2d 250, 251 (Tex.App.—El Paso 1987), aff'd, 764 S.W.2d 782 (Tex.Crim.App.1988). Exigent circumstances include the following: (1) providing assistance to those whom the officers reasonably believe are in need of assistance; (2) protecting police officers from those whom they reasonably believe to be present, armed, and dangerous; and (3) preventing the destruction of evidence or contraband. Gutierrez, 221 S.W.3d at 685.

We use an objective standard to determine whether the officers reasonably relied upon the exigency in question to justify a warrantless entry. Stuart, 547 U.S. at 404. A police officer's subjective motivation is irrelevant in determining whether the officer's actions violated the Fourth Amendment. Id. "An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed objectively, justify [the] action.'" Id. The Texas Court of Criminal Appeals has similarly held that whether a warrantless search runs afoul of the Fourth Amendment "turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time, and not on the officer's actual state of mind at the time the challenged action was taken." O'Hara v. State, 27 S.W.3d 548, 551 (Tex.Crim.App. 2000) (quoting Maryland v. Macon, 472 U.S. 463, 470–71, 105 S.Ct. 2778, 86 L.Ed. 2d 370 (1985)). When assessing whether the officer's inference from facts is objectively reasonable, we may consider his or her training and experience in similar situations. See United States v. Arvizu, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed. 2d 740 (2002) (noting, for purposes of reasonable suspicion analysis, that officers may "draw on their own experience and specialized training to make inferences

8

from and deductions about the cumulative information available to them that might well elude an untrained person").

Discussion

Snodgrass conceded that the officers entered the Lively residence before Joe revealed that they had been abused, but she maintained that the boys' conditions, their shared residence, and their reluctance to return to that residence gave the officers probable cause to believe that there was physical abuse being committed in the household. We agree.

At the time of the officers' entry, they knew that one brother was begging for food and money and appeared to be very thin. He had several bruises and discolorations on his face. Five days later, his brother was found walking barefooted down the interstate highway. When Snodgrass approached him, she noticed a striking resemblance between the two brothers, not just in their physical features but also in the type and degree of their injuries. Both brothers appeared to have extensive bruises and burns. Both brothers seemed hesitant to return to the house. In fact, Joe hid in the backseat of the police car upon nearing his house. Each brother had a different explanation for the source of their injuries. The officers noted that some of the injuries appeared to have been more recently inflicted while others appeared to have been inflicted earlier in time, suggesting that there was likely an ongoing source of the injuries. Based on such information, the officers had probable cause to believe that the instrumentality or evidence of a crime would be found in the residence. See Gutierrez, 221 S.W.3d at 685.

When asked whether she could have just dropped Joe off at his house, Snodgrass responded that, considering what she had observed, she "could not have done that." As the trial court pointed out, we would not want a police officer to have done so in this situation: "If they have information that leads them to believe that some child's welfare is in danger, I want them checked on." The United States Supreme Court has also recognized this aspect of a police officer's role:

> No question has been raised, or reasonably could be, about the authority of the police to enter a dwelling to protect a resident from domestic violence; so long as they have good reason to believe such a threat exists, it would be silly to suggest that the police would commit a tort by entering . . . to determine whether violence (or threat of violence) has just occurred or is about to (or soon will) occur.

Georgia v. Randolph, 547 U.S. 103, 118, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006).

Considered in light of the officers' training and experience, the brothers' injuries, their physical appearance, their demeanor, the fact that each boy's injuries appeared to signal ongoing abuse, their inconsistent explanations of the source of those injuries, and their reluctance to return to their home presented the officers with sufficient information for the officers to form an objectively reasonable belief that Danny or another person in the household was in need of assistance. Such reasonable belief is a recognized exigent circumstance. See Gutierrez, 221 S.W.3d at 685.

Appellant points out that the officers initially left Danny after their encounter and did not seek entry into the house on the basis of probable cause and exigent circumstances. We do not think that this inaction undermines the determination following the second encounter when Snodgrass saw similar, extensive injuries on Joe.

10

Snodgrass's previous encounter with Danny added another "layer or element" to her probable cause determination in the subsequent interaction with Joe. See Estrada, 154 S.W.3d at 609. What may have seemed reasonable during the first encounter became suspicious upon the revelation of a new layer of information during the second encounter. The information gathered, observations made, and conclusions drawn during the second encounter lent themselves to a clearer and different understanding of the previous encounter with Danny. And the previous encounter lent itself to the exigency of the later situation.

## Conclusion

When, within five days' time, two brothers who lived in the same household, bore similar and significant signs of physical abuse, and were reluctant or scared about returning to the house, the officers had probable cause to believe that evidence of a crime would be found in the house. The officers' objectively reasonable concerns regarding the well-being of the victims and other household members serve as the type of exigency that justifies the officers' warrantless entry into the residence.

We overrule appellant's issues and, accordingly, affirm the trial court's judgment.


Mackey K. Hancock
Justice

Do not publish.

11